IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2025

## QUADDARIONTAE[1] BURNOM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dyer County**
**No. 22-CR-50    Mark L. Hayes, Judge**

_____

## No. W2024-00636-CCA-R3-PC

_____

Petitioner, Quaddariontae Burnom, appeals the denial of his petition seeking post-conviction relief from his 2022 guilty-pleaded conviction for second degree murder, for which he is serving an agreed twenty-five-year sentence.  On appeal, Petitioner contends that he received ineffective assistance of trial counsel because counsel failed to adequately explain to him the significance of our supreme court's decision in *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), before he entered his plea.  After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and STEVEN W. SWORD, JJ., joined.

M. Todd Ridley (on appeal), Assistant Public Defender—Appellate Division; Sean Day, District Public Defender; and Patrick R. McGill, Assistant District Public Defender, for the appellant, Quaddariontae Burnom.

Jonathan Skrmetti, Attorney General and Reporter; J. Katie Neff, Assistant Attorney General; Danny Goodman, Jr., District Attorney General; and Lance E. Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The indictment and judgment of conviction spelled Petitioner's name "Quaddriontae"; however, the post-conviction record reflects that the correct spelling is Quaddariontae.

**OPINION**

This case arises from the January 1, 2022 shooting death of Nicholas Sampson. Petitioner was fifteen years old at the time of the shooting and after a hearing in juvenile court, the case was transferred to circuit court. The Dyer County Grand Jury returned an indictment charging Petitioner with first degree premeditated murder.

*a. Guilty plea*

At the plea hearing, the State announced that a plea agreement had been reached. The State noted that Petitioner had been transferred from juvenile court and charged with first degree premeditated murder, for which there was "only one sentence for a juvenile, which is a life sentence" and that Petitioner would be pleading guilty to second degree murder with an agreed sentence of twenty-five years at 100% service.

The State provided the following factual basis for the plea:

> Your Honor, the facts of the case are that on January 1st of 2022, [Petitioner] was at a New Year's party on . . . Light Street in Dyersburg. He was there along with the victim in this case, who was Nicholas Sampson. There were also numerous other people present at that party. The owner of the residence was Angelica Blackwell. She, for some reason, I don't know if she was just tired of the people being there, but she wanted the people to leave, wanted the party to end, so she asked [Petitioner], as well as a couple of others, Preston Landers and Serenity Triplett, to ask the 22 people to leave.

> So, those three did go out onto the porch. They told everyone that they needed to leave the party. [Petitioner] actually had a handgun at that time. When he went out, he kept making the statement over and over to people that were out there, "A-- or bullets; A-- or bullets," is what he kept saying to the individuals out there. At that point, a fight did start in the front yard between Preston Landers and a female who was there, who was Santana Gunn. When that fight began, the victim . . . came out of the house with an attempt, trying to break up the fight. Sometime during that altercation that was going on, [Petitioner] did shoot [the victim] four times. He did strike him three times in the chest and once in the hip, and that did cause his death.

Petitioner testified that he had just turned sixteen and that he had been in the seventh grade before his arrest. Petitioner agreed that he had been charged with first degree murder. The trial court asked, "And you heard [the prosecutor] indicate that the only punishment

that's available if you were found guilty of first degree murder is life imprisonment. Did you hear that?" Petitioner responded, "Yes, sir."

Petitioner testified that he understood that he had the right to plead not guilty and proceed to a jury trial; that the State would be required to prove his guilt beyond a reasonable doubt; and that he had the right to counsel, call witnesses, question the State's witnesses, testify or choose to remain silent, and appeal the jury verdict. He affirmed that he had spoken with trial counsel about his rights and that he was able to talk to trial counsel when he needed to do so. Petitioner affirmed his understanding that, by entering a guilty plea, he was waiving his rights, that his case would be concluded without a trial or appeal, and that his conviction could be used to increase his sentence in future cases.

When asked whether the State's recitation of the facts was correct, Petitioner said that his "involvement in the death of the victim" was correctly stated. Petitioner affirmed that he was voluntarily pleading guilty and that no one had promised him anything or threatened him to plead guilty. The trial court continued examining Petitioner as follows:

THE COURT: Has anybody told you that you have to plead guilty?

[PETITIONER]: No, sir.

THE COURT: Has anybody forced you to plead guilty?

[PETITIONER]: No, sir.

THE COURT: Are you understanding the question that I'm asking you about that? I want to make sure nobody's put you in a position where you feel like you don't have any other choices, because they're going to do something to you?

[PETITIONER]: No, sir.

Petitioner affirmed that he was not under the influence of any drugs, medications, or alcohol. He agreed that he had been able to talk with trial counsel about his case and that counsel had advised him about the consequences of pleading guilty and the risks and benefits of going to trial. Petitioner further agreed that trial counsel had answered all his questions and done everything Petitioner wanted him to do in preparation of the case. Petitioner stated that he was satisfied with trial counsel's representation. When asked twice whether he felt like he understood what he was doing, Petitioner answered affirmatively both times.

Petitioner testified that he signed the plea form, that trial counsel explained the form to him, that he understood it, and that the agreed sentence was filled out at the time he signed it. Petitioner denied that he had any questions. When asked whether he wanted to go into the hall and talk to trial counsel further, Petitioner answered negatively. Petitioner agreed that he felt he was acting in his own best interest.

Upon examination by trial counsel, Petitioner testified that the trial court had reviewed everything they had talked about "for weeks and weeks[.]" Petitioner agreed that his mother was present at every meeting with trial counsel and that they had talked about the degrees of homicide, what the State would have to prove for each one, and the potential sentences. Petitioner affirmed that some of their meetings lasted hours and that trial counsel had provided Petitioner his cell phone number. Petitioner agreed that pleading guilty was a difficult decision and that he understood that he would be age thirty-five or thirty-six when he was released, provided he "successfully complete[d] the program." Petitioner agreed that his mother had advised him and helped him make the decision to plead guilty, along with other family members.

The trial court found that Petitioner's plea was knowing and voluntary, that there was a factual basis for the plea, and that it would approve the plea of second degree murder and a twenty-five-year sentence.

### b. *Booker*

On November 18, 2022, the Tennessee Supreme Court issued *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), a plurality opinion holding "that an automatic life sentence when imposed on a juvenile homicide offender with no consideration of the juvenile's age or other circumstances violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution." *Id.* at 52. The court reasoned that "in juvenile first-degree murder cases, *and only in these cases*, a sentence is automatically imposed without considering age, the nature of the crime, or any other factors." *Id*. at 63 (emphasis added). The *Booker* court fashioned the following remedy for cases where a juvenile homicide offender was automatically sentenced to life:

> In remedying this constitutional violation, we exercise judicial restraint. We need not create a new sentencing scheme or resentence Mr. Booker—his life sentence stands. Rather, we follow the policy embodied in the federal Constitution as explained in *Montgomery v. Louisiana*, 577 U.S. 190, 136 S. Ct. 718, 193 L.Ed.2d 599 (2016) and grant Mr. Booker an individualized parole hearing where his age and other circumstances will be properly considered. The timing of his parole hearing is based on release eligibility in the unrepealed version of section 40-35-501(h)(1), previously in effect,

- 4 -

that provides for a term of sixty years with release eligibility of sixty percent, but not less than twenty-five years of service. Thus, Mr. Booker remains sentenced to sixty years in prison, and after he has served between twenty-five and thirty-six years, he will receive an individualized parole hearing where his age and other circumstances will be considered. Our limited ruling, applying only to juvenile homicide offenders, promotes the State's interest in finality and efficient use of resources, protects Mr. Booker's Eighth Amendment rights, and is based on sentencing policy enacted by the General Assembly.

*Id*. at 53.

### c. *Post-conviction proceedings*

On October 3, 2023, Petitioner filed a timely pro se petition for post-conviction relief ("the Petition"). In relevant part, Petitioner argued that he received ineffective assistance of trial counsel, which resulted in his entering an unknowing, involuntary, and unintelligent plea. Petitioner stated as follows:

Petitioner's guilty plea was entered on December 20, 2022; just 32 days [a]fter the [Tennessee Supreme Court's] ruling [in *Booker*] prohibiting the imposition of a life sentence upon [] Petitioner if, convicted at trial. Trial counsel's advice to the Petitioner and to the Petitioner's mother was that, []if convicted at trial of first degree murder, the Petitioner faced an automatic sentence of life in prison without parole meaning that, Petitioner will have to serve at least, fifty-one (51) years day-for-day, before becoming eligible for release. Therefore, trial counsel's advice was reprehensibly incorrect and designed to strike fear into the juvenile Petitioner and [his] mother's mind; thus convincing [] Petitioner and his mother that Petitioner should accept the plea agreement offered by the State for a twenty-five (25) year sentence @ 100%, for a lesser . . . offense of second degree murder.

[] Petitioner asserts that he did not truly wish to plead guilty, but wanted to exercise his right to a jury trial and testify in his own defense that, [he] was merely defending himself against the victim's violent and threatening actions. [] Petitioner asserts that, had he known about the landmark decision in *Booker*, and that Petitioner could not have been exposed to an automatic life sentence, he would not have plead guilty . . . [and] would have instead, insisted upon a jury trial.

After post-conviction counsel was appointed, Petitioner filed a notice that no amended post-conviction petition would be filed. At the post-conviction hearing, Geitha Porter testified that she was Petitioner's mother and that she was present for all of Petitioner's meetings with trial counsel. Ms. Porter stated that they met with trial counsel five times before the plea hearing. She agreed that, at every meeting, trial counsel discussed "over and over" that Petitioner faced "51 years to life without parole" if he was convicted of first degree murder at trial. She said that, from the first meeting with trial counsel, Petitioner maintained that he did not want to plead guilty and wished to proceed to trial.

Ms. Porter testified that, on the day of the plea hearing, she and Petitioner met with trial counsel accompanied by her sister Latonya Hockett and Ms. Hockett's daughter. According to Ms. Porter, Petitioner still wanted to go to trial. She noted that, when they were in that last meeting, trial counsel repeated that Petitioner would serve fifty-one years if he was found guilty, whereas the plea offer was for twenty-five years. Ms. Porter urged Petitioner to accept the plea offer because, if he was found guilty, she would "never have a chance to see [him] again. [He] would do life." She stated that, in response, Petitioner changed his mind and decided to plead guilty, although he was "crying, saying he didn't want to take it."

Ms. Porter testified that, to her knowledge, trial counsel never spoke to her about a change in the law or the *Booker* case specifically. Ms. Porter stated that the first time she heard about *Booker* was two weeks after the plea hearing, when her cousin called and told her about it. She denied that trial counsel ever discussed with them that Petitioner would be eligible for parole after twenty-five years if he received a life sentence at trial.

On cross-examination, Ms. Porter acknowledged that, at the time of the guilty plea, there was no question that Petitioner shot the victim. She stated that they hired trial counsel when the case was pending in juvenile court because he was recommended by a friend and was "very highly respected." Ms. Porter said that trial counsel insisted she be present at all of his meetings with Petitioner. Ms. Porter stated that she and Petitioner were familiar with the State's proof, which did not change between the juvenile transfer hearing and Petitioner's December 2022 guilty plea.

Ms. Porter agreed that the State's offer was made "very late" in the case. Ms. Porter denied that she could have confused discussion about Petitioner's being paroled at age fifty-one with earlier conversations about his serving a fifty-one-year sentence.

Ms. Porter affirmed that, until the State extended its offer of twenty-five years in November 2022, the only other offer it made was for Petitioner to plead guilty as charged. Ms. Porter said that, to her knowledge, a trial date was never set. When asked whether

there was "no rush" to plead on a particular day, Ms. Porter responded, "It actually was a rush because we kept asking for more time and [trial counsel] kept telling us that the DA wouldn't give us more time."

Ms. Porter denied having called trial counsel to ask about *Booker* or going with trial counsel to explain the implications of *Booker* to Petitioner. Ms. Porter stated her belief that the State extended its new offer before *Booker*'s issuance.

On redirect examination, Ms. Porter testified that the State extended the new offer "two or three months before" *Booker*. Ms. Porter stated that the plea offer would have expired if Petitioner did not accept it on the day of the plea hearing.

Latonya Hockett testified that she was Petitioner's aunt and that she was present during Petitioner's meeting with trial counsel on the day of the plea hearing. She stated that they met in a private room for about thirty minutes. Ms. Hockett testified that Petitioner was crying and told her that he did not want to accept the plea offer. According to Ms. Hockett, trial counsel told them that, if Petitioner went to trial, he "would get 50 to life" and that Ms. Porter began to cry and told Petitioner he should plead guilty so that she could see him again. Ms. Hockett stated that trial counsel did not discuss other sentences with them. Ms. Hockett stated that she told Ms. Porter that they could not force Petitioner to take the plea offer, but that Petitioner decided to accept it. Ms. Hockett said that "the officer . . . gave [them] a little bit more time" but that her impression was that Petitioner was running out of time to decide. She noted that Petitioner was "crying and just laying on [her]" because he "didn't want to do it." Ms. Hockett stated that trial counsel encouraged Petitioner to plead guilty by telling him that, if he proceeded to trial, he was "taking a chance of getting life."

Petitioner testified that he was seventeen years old at the time of the post-conviction hearing. Petitioner stated he understood that, if the post-conviction court vacated his guilty plea, he could go to trial and be convicted of first degree murder. He affirmed that he wanted to continue with the post-conviction proceedings.

Petitioner testified that the last grade of school he completed before the shooting was seventh or eighth grade. He stated that he read and wrote "pretty okay" but that he had "mental disorders" when he was in school. Petitioner did not know the name of the disorders, but he referred to having an individualized education plan. Petitioner stated that he had not been in juvenile court for committing delinquent offenses before the shooting, although he had attended an alternative school "for something." He denied that he was familiar with the adult court system.

Petitioner testified that he met with trial counsel about six times before entering his guilty plea and that his mother was present for every meeting. Petitioner stated that, during their first meeting, trial counsel conveyed a plea offer "for the [fifty-one] years" and told him that he also faced a fifty-one-year sentence at trial. Petitioner told trial counsel that he wanted to go to trial. Petitioner testified that trial counsel later conveyed the State's twenty-five-year offer. He stated that, although he did not know the exact date, it was "[p]robably like a few months" before the day of the plea hearing.

Petitioner testified that, before the plea hearing, trial counsel told him that the offer would expire that day. Petitioner denied that he knew anything about the *Booker* case or the change in the law stating that juveniles were entitled to a parole hearing before fifty-one years. Petitioner stated that, at the time he entered his plea, he believed that he would serve fifty-one years if convicted as charged at trial. Petitioner testified that he learned about *Booker* three weeks after he entered his plea, when Ms. Porter told him about it during a telephone call. Petitioner stated that he thought his plea "was kind of for nothing" because, if he had been convicted at trial, he faced "almost . . . the same thing" as the twenty-five-year agreed sentence.

When asked why he wanted to vacate his guilty plea, Petitioner stated, "I felt like [trial counsel] gave me untruthful information about my plea and the sentencing that I could get regarding my charge[,] and I feel like my plea was not knowing[ly] and voluntarily entered." Petitioner averred that, if he knew that he would have been eligible for parole before fifty-one years, he would not have pleaded guilty. Petitioner read a statement he prepared for the hearing, which included a denial that he intended to kill the victim and his belief that a jury would acquit him "if they heard all the facts." Petitioner also noted his desire to have a sentencing hearing "that would allow [him] to get a sentence less than the maximum." Petitioner also stated that trial counsel was ineffective "for advising [him] to plead guilty in order to avoid a life sentence, which [he] could not get anyway[.]"

On cross-examination, Petitioner testified that he thought he could have convinced the jury that he acted in self-defense. Petitioner noted that he told trial counsel that he fired the gun accidentally as he fell backward after the victim attacked him and that a bullet hole in the porch ceiling would corroborate his version of events.

Upon being shown the medical examiner's chart of the victim's injuries, which included three gunshot wounds in a "pretty tight grouping . . . in the middle of [the victim's] chest" and a fourth gunshot wound in the lower abdomen, Petitioner maintained that the shooting was accidental. Petitioner agreed that the victim was unarmed; he noted that the victim attacked him "[w]ith his hands."

Petitioner testified that he heard the State's witnesses testify at his juvenile transfer hearing. He denied learning about any new evidence between the transfer hearing and his guilty plea. When asked why the case did not go to trial, Petitioner stated that trial counsel advised him that he was facing a life sentence if he was convicted at trial and that "it would be best" if he took the twenty-five-year offer.

Petitioner testified he understood that, if he went to trial and was convicted of first degree murder, he might have to wait until he had served thirty-six years before getting a parole hearing and that receiving parole was not automatic.

District Attorney General Danny Goodman testified that he personally handled Petitioner's case. He agreed that, initially, the victim's mother "did not want anything less than a conviction for first degree murder" and that the only plea offer he extended to Petitioner was to plead guilty as charged. General Goodman said that the State's anticipated proof did not change between Petitioner's transfer to adult court and *Booker*'s issuance in November 2022.

General Goodman testified that *Booker* was the only reason that he extended the twenty-five-year offer. General Goodman explained that he learned of the decision a few days after it was issued and that he called trial counsel "to tell him that . . . this case had come out and that [he] thought it could have an impact on his client's case." General Goodman and trial counsel discussed *Booker*, and he told trial counsel that he needed to speak to the victim's mother but that it could change the State's offer.

General Goodman testified that, after a lengthy discussion about *Booker*, the victim's mother agreed to a plea offer for second degree murder and a twenty-five-year sentence. General Goodman stated that trial counsel asked him whether a lesser sentence would be acceptable but that he declined because the victim's mother would not agree to anything but the maximum sentence.

On cross-examination, General Goodman testified that the District Attorney General's Conference explained *Booker* to him at a monthly meeting. After that meeting, General Goodman called trial counsel; he did not recall whether trial counsel was already aware of the case. General Goodman agreed that the plea hearing was a few weeks before the trial date; he further agreed that he told Petitioner at the hearing that the plea offer would be withdrawn that day. General Goodman noted, though, that Petitioner knew about the offer before the day of the plea hearing. General Goodman testified that Petitioner was "iffy" about the plea offer when he arrived in court on the day of the plea hearing and that trial counsel "went back and talked to him."

When asked about his and the trial court's stating at the plea hearing that Petitioner faced a life sentence if he went to trial, General Goodman stated, "Well, I think that's correct. I think even with the change in *Booker* that's what you get. You get life. It's just you're eligible for parole once you hit that 25-year mark. It doesn't mean you're going to get it."

Trial counsel testified that he had been practicing law for forty-three years and that he had handled about 100 criminal jury trials. Ms. Porter retained trial counsel prior to Petitioner's juvenile transfer hearing. Trial counsel stated that he advised Petitioner at every meeting until November 2022 that he was facing a life sentence, which was a minimum of fifty-one years and a maximum of sixty years.

Trial counsel testified that he asked General Goodman multiple times about the State's extending an offer "of something besides life" but that General Goodman said the victim's mother refused to allow it. Trial counsel agreed that the trial was set for January 11, 2023, and that the plea hearing occurred on December 20, 2022.

Trial counsel estimated that he met with Petitioner at "the McDowell Center" two or three times and that, after Petitioner was transferred, they met once per month or every six weeks. Trial counsel stated that Ms. Porter was present for all of his meetings with Petitioner.

Trial counsel testified that Petitioner gave him a detailed account of what happened the night of the shooting. Petitioner told him that a friend who was thirteen years old brought a gun to the party and that the homeowner asked Petitioner to take the gun and get rid of it; Petitioner stated that he put it in his pocket and forgot about it. Petitioner told him that, at some point, a fight broke out between several women in the front yard; the victim "came flying in" to the fight because one of the women was his sister. Petitioner stated that he tried to break up the fight and was "involved in it" before retreating to the porch. According to Petitioner, the victim "looked at him real hard, like angry . . . . And . . . said that was my sister and he started charging toward" Petitioner. Petitioner stated that he shot the victim because he was afraid the victim would hurt him.

Trial counsel testified Petitioner told him that he fired the gun accidentally as he fell backward and that one of the shots went into the porch ceiling. Trial counsel noted Petitioner also said that, as he fell, he scraped his back against the edge of the porch. Trial counsel stated that Petitioner had no scar. Trial counsel said that he immediately visited the crime scene and looked for a bullet hole in the porch ceiling; however, there was no hole or evidence that the ceiling had been repaired. Trial counsel stated that it would have been difficult to argue Petitioner's version of events in light of the lack of evidence.

Trial counsel testified, though, that he was prepared to proceed to trial on a theory of self-defense. Trial counsel testified that, in their meetings, he told Petitioner that self-defense "has to be the equivalent force" and that he did not know if they could convince a jury that he had the right to shoot the victim.

Trial counsel stated that he learned about *Booker* over Thanksgiving weekend when Ms. Porter called him and asked if he knew about it. Trial counsel testified that, within the next week, he and Ms. Porter visited Petitioner at the Dyer County jail; the State had not yet made its new plea offer at that time. Trial counsel stated that he never told Petitioner the name of the case, but he told Petitioner that "they did away with the 51 years." Trial counsel said that he referred to the ages at which Petitioner would be parole eligible, rather than the number of years. Trial counsel stated that Petitioner would have a parole hearing when he was age forty and that, if he did not receive parole, his next hearing would be when he was age fifty-one. Trial counsel testified that he told Petitioner that parole depended on his behavior as a prisoner. Trial counsel agreed that "[t]he life part [of the sentence] never changed. It's just the eligibility to get out on parole."

Trial counsel testified that, soon after that meeting, he contacted General Goodman, discussed *Booker*, and suggested a plea agreement to second degree murder. Trial counsel tried to negotiate a shorter sentence, but General Goodman refused and told him that the victim's mother would not agree to that. Trial counsel testified that *Booker* was the only reason General Goodman extended the new offer.

Trial counsel conveyed the offer to Petitioner and Ms. Porter at a meeting at the jail. He told Petitioner that the offer would allow him to be released at age thirty-six. Trial counsel stated that Petitioner did not want to accept the offer and was "still thinking self-defense." When asked whether trial counsel "talk[ed] him into" accepting the offer, trial counsel responded negatively and noted that Petitioner did not decide that day.

Trial counsel testified that the plea "cut-off date" was December 20 and that, before court, trial counsel met with Petitioner, Ms. Porter, and two female relatives. Trial counsel stated that he told Petitioner again that pleading guilty to second degree murder meant that he would serve twenty-one years and "definitely" be released at age thirty-six, "[g]uaranteed." Trial counsel agreed that no risk was involved because Petitioner's release would not depend upon the parole board. Trial counsel stated, "So the guarantee was 36 years old. The maybe was 40 years old or 51, depending on the parole board, and that's the risk."

Trial counsel testified that one of Petitioner's family members explained to Petitioner how parole worked. Trial counsel stated that Petitioner and his family were crying. He said, "I don't want to say that [they] were pressuring him to take the deal, but

- 11 -

it just -- it was obvious to me that they were afraid that if he went to trial and lost it would cost him a lot of years in jail."

On cross-examination, trial counsel testified that he did not know if he discussed the name of *Booker* with Ms. Porter. He explained, "If I ever used that word, it would have been just in passing." Trial counsel stated that he believed Petitioner understood the plea agreement. He stated that he gave Petitioner ages at which he would be eligible for release because he thought it would be "more relevant to a young person[.]" Trial counsel stated that, although Petitioner only had formal education through the seventh grade, Petitioner was "[v]ery intelligent common sense-wise . . . . He's a smart young man and able to communicate with you."

Trial counsel testified that the meeting before the plea hearing was very emotional. Trial counsel stated that he believed everyone in the room "knew what we were talking about" because one of Petitioner's relatives discussed the possibility of parole being denied and what happened after. Trial counsel estimated that the plea offer was open for a month at most.

The post-conviction court entered an April 8, 2024 order denying post-conviction relief. In the order, the post-conviction court noted that the testimony of Petitioner, Ms. Porter, and Ms. Hockett conflicted with the testimony of General Goodman and trial counsel. The post-conviction court explicitly credited the testimony of General Goodman and trial counsel and found that Petitioner and Ms. Porter's assertion that the State extended its plea offer before the issuance of *Booker* "cannot be true" based upon General Goodman's testimony that the offer was made in response to *Booker*'s holding.

The post-conviction court noted:

No claim is asserted by [P]etitioner that [trial counsel] failed to fairly analyze the risks and benefits of trial versus a plea agreement. The focus of that portion of the petition is that [trial counsel] inaccurately advised the [P]etitioner of the possible punishment he would receive if convicted of first-degree murder.

The post-conviction court noted Petitioner's testimony at the plea hearing that his decision to plead guilty was voluntary, that he had not been threatened, and that he had not been "put in a position where he felt he had no other choice." The post-conviction court found that trial counsel's advice regarding Petitioner's exposure at trial changed in light of *Booker*. The post-conviction court further found that trial counsel "made use of the *Booker* decision to negotiate a plea to second-degree murder which would assure the release of the

[Petitioner] even earlier than a possible parole review date as a juvenile offender under the principles in *Booker*." The post-conviction court continued,

> [Trial counsel] sought a more lenient plea agreement or the opportunity for an open plea to second-degree murder, both of which were rejected by the [S]tate. He accurately advised [P]etitioner of the change in sentencing if [P]etitioner was convicted of first-degree murder as soon as he was aware of the *Booker* decision. [P]etitioner's mother was present at every meeting [P]etitioner had with counsel.
>
> [P]etitioner had the benefit of good and experienced counsel and made reasonable decisions based upon advice from counsel that was the product of counsel's complete investigation, fair analysis of the risks and benefits of proceeding to trial, and with the benefit of the latest caselaw applicable to [P]etitioner's circumstances . . . . [Trial counsel's] performance as defense counsel far exceeded the minimum standards for defense counsel representing a juvenile felony offender. [P]etitioner received the effective assistance of counsel.

**Analysis**

On appeal, Petitioner contends that the post-conviction court erred by denying relief because trial counsel provided ineffective assistance, leading Petitioner to enter an involuntary and unknowing plea. Petitioner avers that the post-conviction court's resolution of the witness testimony in favor of General Goodman and trial counsel "was incomplete and therefore in error." Although Petitioner acknowledges that this court is bound by the post-conviction court's accrediting trial counsel's testimony that he explained the effect of *Booker* to Petitioner, Petitioner avers that "the circumstances required more." Specifically, Petitioner complains that trial counsel "did not mention the name of [*Booker*] or discuss the specifics of the underlying case." Petitioner also argues that he should have been given more time to consider the plea agreement because *Booker* was confusing and issued one month before he entered his plea. Petitioner notes that he was young, had learning difficulties, and had no knowledge of the court system. Petitioner asserts that he was "forced to make this life altering decision under intense pressure . . . . in a matter of hours, if not minutes," because the State's offer was set to expire that day. Petitioner does not explain how trial counsel should have delayed the proceedings.

The State responds that the extent of trial counsel's explanation of *Booker* to Petitioner was not raised in the post-conviction court. The State argues that because Petitioner relies upon different grounds for relief on appeal than raised in the court below, Petitioner's issue has been waived. Alternatively, the State submits that trial counsel's

performance was not deficient and that Petitioner did not prove by clear and convincing evidence that, but for the alleged deficiency, he would not have pleaded guilty.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see Dorsey v. State*, No. W2021-01135-CCA-R3-PC, 2022 WL 2840738, at *4 (Tenn. Crim. App. July 21, 2022), *perm. app. denied* (Tenn. Dec. 14, 2022). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*. at 59.

As a preliminary matter, we acknowledge the State's position that Petitioner's ineffective assistance claim on appeal is distinct from the one raised in the post-conviction court. However, we think that the issue is similar enough to permit our review on the merits because the post-conviction court considered and addressed trial counsel's explanation of *Booker* and the nature of Petitioner's plea. *Cf. Holland v. State*, 610 S.W.3d 450, 459 (Tenn. 2020) (holding that, in post-conviction cases, this court is without authority to review issues not raised during the post-conviction proceedings or addressed by the post-conviction court).

However, to the extent that Petitioner makes a separate argument that the special circumstances attendant to juvenile defendants, as articulated in *Booker* and *Miller v. Alabama*, 567 U.S. 460, 471 (2012), should extend to enhanced standards of assessing whether a juvenile defendant is sufficiently informed to make a knowing and voluntary guilty plea, it was not raised in the court below and has been waived. *See Holland*, 610 S.W.3d at 459.

The State also urges this court to waive any freestanding claim contesting the knowing and voluntary nature of the guilty plea, arguing that Petitioner's stated issue on appeal is ineffective assistance of counsel. In Petitioner's appellate brief, he states that the sole issue is "[w]hether the post-conviction court erred when it found that . . . trial counsel provided effective assistance to enable [Petitioner], a minor, to knowingly agree to plead guilty to second-degree murder and to accept a 25-year sentence of incarceration."

We do not believe that Petitioner attempts to raise the nature of his plea as a separate issue, but rather, he discusses it only as a result of trial counsel's alleged ineffective assistance. To the extent he may have intended to do so, we note that this court recently considered a similar case and concluded that the only issue properly presented was "that [the petitioner's] plea was invalid because he was denied the effective assistance of counsel." *Webb v. State*, No. M2024-00833-CCA-R3-PC, 2024 WL 5087470, at *2-3 (Tenn. Crim. App. Dec. 12, 2024) (discussing that this court would limit its review to ineffective assistance, notwithstanding petitioner's having discussed "other factors more

typically considered in assessing the voluntariness of the plea apart from ineffective assistance"), *perm. app. denied* (Tenn. Mar. 12, 2025).

We conclude that the record amply supports the post-conviction court's finding that trial counsel rendered effective assistance in this case. Trial counsel stayed abreast of changes in the law and used *Booker* to negotiate a beneficial plea agreement that would allow Petitioner's guaranteed release after serving twenty-one years, assuming that he earns good time credit. The post-conviction court credited trial counsel's testimony that he thoroughly explained to Petitioner how *Booker* changed his sentencing exposure, the choices available to him, and the risks and benefits. Trial counsel was cognizant of Petitioner's youth and endeavored to communicate the abstract aspects of release eligibility by referring to Petitioner's age at his potential release. Contrary to Petitioner's assertion that he had to decide whether to plead guilty in hours or minutes, trial counsel, Petitioner, and Ms. Porter agreed that trial counsel told Petitioner and Ms. Porter about the plea offer well before the plea hearing, although the exact timing differed; at minimum, Petitioner had two or three weeks to consider his decision.

Similarly, the record does not support Petitioner's assertion that, as a result of trial counsel's alleged deficiency, he entered an unknowing and involuntary plea. Contrary to Petitioner's characterization of the plea hearing as "perfunctory," the record reflects that the trial court took great care with Petitioner, explained his rights in an accessible manner, allowed him opportunities to ask questions, and offered him more time to speak to trial counsel before entering his plea. Petitioner affirmed under oath when questioned by trial counsel and the trial court that trial counsel had explained his options and rights, that he wished to plead guilty, and that he understood what he was doing. Petitioner has not overcome the "formidable barrier" of the statements he made under oath at the plea hearing. *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) (holding that statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings" disputing the knowing and voluntary nature of the plea). Petitioner is not entitled to relief on this basis.

## Conclusion

We affirm the post-conviction court's denial of the Petition.

s/ *Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE

- 16 -